Alright, the first case we call is Sharpe v. Winterville Police Department, and Mr. Tutte, I think it's you first. May it please the court. This case raises questions that strike at the very heart of the First Amendment's most important protections. The right to film police officers in the discharge of their duties in public, subject only to reasonable time, place, and manner restrictions, is a clearly established First Amendment right. Can I ask you this? This is sort of a preliminary question. The briefs on both sides spend a lot of time talking about a First Amendment right to photograph police work in public, whether by the press or friends or other people watching. And cases seem to support a First Amendment claim there. And the debate in the briefs seem to be whether the Fourth Circuit ought to do that. And my question is whether that's relevant at all. In other words, it seemed to me that the issue we have in this case is what may the police do to persons that are subject to a Terry stop or a traffic stop or an arrest? In other words, when they're in the police control, what may the police do? And usually we start that type of analysis under the Fourth Amendment. And if we do it that way, the analysis is different from the way you guys have advocated in the brief. Both of you have done this. And so that's my own take on this, is that this is a traffic stop. And during a traffic stop, there are a bunch of incidents that the Supreme Court has recognized, the first of which is both the driver and the passenger are subject to the stop. And they both have about the same rights. And the police officers have about the same rights with respect to them. For instance, you can tell the guy to step out, sit on the curb. If a statute says you can require him to answer his name, you can require a bunch of stuff. You can probably, if he has an open gun, you can probably say, just for the purpose of the stop, let's remove the gun. If you're worried about it, you can frisk. So there are a whole bunch of incidents under a traffic stop. And in this case, the officer says, we're not going to have live broadcasting. He says, you can film it, but we're not going to have live broadcasting during the stop. Now, the question is, if I'm right about this is a Fourth Amendment question during a stop,  I know your First Amendment arguments, and they're standard. Your Honor, if this were a Fourth Amendment case and there were a Fourth Amendment analysis, I think the analysis would be completely different. And we don't raise a Fourth Amendment claim for that reason. I understand, but I don't understand. You know, if the police officers arrest somebody and take them into a questioning room at the police station, and they start questioning them, they take away his cell phone, and they say, you can't make a call. Yes. If you invoke an attorney, we'll stop questioning you. You can call an attorney. And they have that control. Now, the question is, why do they have that control? And why doesn't it apply in a Terry stop or a traffic stop? I think, Your Honor, that is in the case, and it's an important question, but it's analyzed under a First Amendment analysis in this case. And the question, yes, Your Honor. In other words, it's not a First Amendment case because it's First Amendment to the extent that the police officer's rights to control the circumstance impinge on the pavement. But, you know, the officer tells them to sit down at the curb. That's First Amendment freedom of movement, and it impinges on that. It tells them you can't have a gun during this stop. That's Second Amendment. You go down the whole list that during the stop, he gets certain rights. And so to the extent you're talking about people in the public photographing police work or the press photographing police work, to me, from my own point of view, that's irrelevant. I think the question you ought to be addressing is, what rights do the officer have during the course of a traffic stop? Your Honor, the officer doesn't have, I want to make this clear, has no interest in privacy with respect to a traffic stop that happens on a public street. His argument for suppressing telecommunications, he even said you could photograph, but he said the telecommunications is to worry about interfering with the stop, interfering with questioning, interfering with safety, somebody calling a gang around the thing. All of these things are concerns that the officer might have if the people he's stopping are telecommunicating during the stop. The difference here is that Mr. Sharp was merely broadcasting passively. That's what's alleged in the complaint. This went off on a 12B6. It's alleged in the complaint, and I think evident from the videotape, is that Mr. Sharp was passively recording what was happening, and the officers had no specific or articulable reason. I can address exactly what happened factually. I don't think there's a lot of dispute with that. The record's a pretty good record. But my question is more of a categorical question, is what rights does an officer have to maintain control of the circumstances? That's what the Supreme Court has indicated the officer has a right to do during a traffic stop. And your argument is the officer may not stop broadcasting during a traffic stop because that infringes on a First Amendment right. Not without further justification than the simple fact that the person happens to be in the vehicle that was stopped. Can I just follow up? I want to make sure I understand the point. Would your argument be any different if the guy, your client, was trying to record after he was arrested? It would be much different, yes, Your Honor. Help me understand why. For one, he would be in police custody, so there would be a completely different set of interests. This is a Terry stop where— But the challenge there is, then that sort of suggests that Judge Neumeier's got more of a point because then it is the nature of the custody matters, right? And so the fact that he's under a Terry stop or he's in arrest, or maybe he wanted to live stream his imprisonment, right? So he wanted to have a GoPro camera that he could live stream his treatment in prison. All of those things, it seems to me, have similar First Amendment-sounding interests. They do. But they have very different Fourth Amendment-sounding interests. And so I think you can see that those are going to be treated differently. So help me understand why your point is that the Fourth Amendment issue just doesn't matter. And the reason is that if Mr. Sharp had been being followed around by a live camera crew, for instance, let's say he was arrested and the live camera crew was following him, or he had a drone that was following him and live broadcasting what was happening, I think that the First Amendment analysis would favor Mr. Sharp because there wouldn't be a reason to restrict the broadcasting. What's that issue really, the core of the issue? Those are the rights of the people doing— Those are the rights of the people outside that were not being stopped. In other words, those are members of the public or the press. The question is—I'd like to get back to the question that was just posed to you, and that is you agreed that during an arrest he could not broadcast simultaneously, right? On the assumption that he's trying to hold a phone in his hand. It doesn't matter. During an arrest, they say they take his phone away. They have to get a warrant probably to open it up, but they take the phone away from him. Well, that would be why— Is that illegal? Exactly, and that would be—these are incidental impacts. Let me ask my question, please. Yes, Your Honor. My question is, during an arrest, if the officer has a right to take the phone away and prohibit broadcasting, what is the reason for that? That the individual needs to be detained or arrested so that they cannot take any action adverse to police officers. Take the phone away. How does that accomplish that? Mr.—and I want to answer Your Honor's question, but it's important to frame what Mr. Sharp was in this context. But can you start with the question? Because I'm sort of interested in the question. If you are arrested, there's probable cause that you have just committed a crime, and officers— That's no question. The question is, what is the value being served by removing a telephone during an arrest? Why is that appropriate? I mean, you are restricted entirely of your liberties when you're arrested. But why? No, not entirely. You know, if you hogtie them, right, we wouldn't say that's okay. Right? There are lots of things that you can do. Like maybe, why can't—you've got to be handcuffed, right, so that you can't get to a gun. But, you know, you can hold your phone. Right? That wouldn't necessarily be required for an arrest. And so— I mean, we're talking about technologies that don't exist. But if he had an implant in his eye that allowed him to livestream his arrest, there would be no officer interest in making him turn it off. They could take it out. Yeah, they could take it out. We don't agree. We don't agree. Unless he's going to a place that the police have an interest in privacy in, there is no rational justification for that. You just agreed with me that the police, during an arrest, can take the phone away. Right. Prohibit live—let me finish the question. Live broadcasting. I want to know what interest the officer has in removing that phone. And you haven't answered that question. Yes, it's in restraining the suspect. It is not in— What's he restraining? Taking the phone away? People are put in handcuffs when they're arrested, Your Honor. Pardon me? People are put in handcuffs when they're arrested, and their individual possessions are taken. They may not be. They can be. They can be. But the officer takes the phone, right? Inevitably, they take the phone. Your Honor, if there was a film crew following him while he was being arrested, and they were under his command, so they were working as his agents, he could still have them film him. I think he's trying to ask you a question. I'm not sure why you're so excited right now, but I think you want to try to answer his question and not talk over it. My apologies, Judge Richardson and Judge Niemeyer. I apologize. This is the last time you can answer or not, but it's going to help me a lot in this case, is what is the value? You say he's under arrest. He has to have control. Is that the answer? In other words, to take his phone away, how does that further that interest during an arrest? It furthers the officer's interest in arresting the suspect. I understand, but take it further. What's that mean? Stopping any criminal conduct. The person who's been arrested. And taking the phone away does what? Well, it protects the privacy of parts of the police. Not privacy. It protects communications. It takes the risk. Police statement. Interference, right? Police stations are private. The back of a police car is private. They have very fundamentally different privacy interests for the police, as First Amendment cases have pointed out. But I really think the reason that arrests can have. Which case do you think says there's a privacy interest in an arrest? The one that says that when the government owns the property, it gets to control what goes on there. It's a forum doctrine case by Justice Black. I think the idea is that they have taken control of the defendant, and they're controlling the circumstances, and one of the lack of controls is the communication with the public. Mr. Sharp could have been a seven-year-old child. Right? Your Honor, Mr. Sharp could have been a child in the car. No, let's stick with my hypothetical. He could have been. Because families are pulled over on the roads all the time. And I apologize, Judge Niemeyer, if I've interrupted. I'm just trying to get to the distinction, which we see as very straightforward. You're not answering my question or focusing on it at all. My next question, after we would explore that, would be why doesn't that value apply in a Terry stop or in a traffic stop? And I didn't get to that, but you can go ahead and make your argument. Let me go back to this arrest idea, because I think the point that Your Honor is trying to tease out is you think that there's sort of a per se interest once an individual is arrested. No, I'd like to know the actual value, the actual reason why it's an arrest. We don't take off the guy's pin where he says, I am a Republican or I am a Democrat while he's in the car and arrested. But we do take away his phone. And the question is, why do we take away his phone? And the answer is, I think, is that it relates to both safety and to interference with the arrest. We do not want him communicating outside while he's under the control of the police. And we do not want him exposing the officers to further somebody else called in and all the dangers that could arise after somebody's been arrested. And so if those are the values of why we take the purposes of why we take the phone away during an arrest, then my next question would be, why don't those same things occur when there's a traffic stop and the Supreme Court says that the officers have a right to control the circumstances and maintain control during the traffic stop of some half hour or whatever it is. And the court has said that two or three times. So I think one thing is that this is an unexplored area of Fourth Amendment law. I don't have any cases where someone has asserted a Fourth Amendment violation for their phone being taken away. I don't agree that the principles that dictate why phones are taken away when individuals are arrested is so clear. And that's illustrated by the fact that the person could have a confederate right there filming the entire thing happening, and we wouldn't think that it was okay to take that confederate's phone away even if that person was affiliated with the person who had just been placed under arrest. This is an important point because the difference between a mere bystander and the person who's actually being subject to a Terry stop or an arrest is often a very thin one. This case has important consequences for every police citizen interaction in this circuit. If the subject of Mr. Sharp was not the target of this stop, he was a mere passenger in the vehicle. Yeah, but you're now forgetting all the principles of traffic stops. MIMS and all these other cases and its prodigy all have talked about the fact that the passenger is subject to the same control as the driver. The same control, yes, Your Honor, but the interest is in the same level of custody. It's not custody, not in the formal sense, but he's under the same control. He can be directed what to do. If there's a local statute that says he has to identify himself, he can force him to identify himself. He can make him sit on the curb. He can take a gun away. He can. But there are limits, Your Honor. Right. And we recognize that we're exploring that today. Yes, Your Honor. Exactly. And so the strict limitations, we think that this is this falls well within the kinds of things that are off limits. They couldn't take his phone and search it just because they had to get a separate warrant to search it. But that's a different issue altogether. So there can be incidental impacts on broadcasting. We don't dispute that. If they say we need to see your hands, he's going to need to put the phone down. If they say that he needs to step out of the vehicle, he will be required to step out of the vehicle. He's going to need to put the phone down. But the target on this case was the broadcasting. And if the circumstance is justified, he can be frisked. The passenger can be frisked. Absolutely. I mean, I don't dispute any of what you're saying. And suspicious items can be removed from his body. I agree. You couldn't do that to the press watching. You couldn't do that to the public watching. So the question is, if we're under the Fourth Amendment analysis, what is the standard to determine whether the officers in this case acted appropriately? My question, under the Fourth Amendment, what is the standard that we have to apply if we apply the Fourth Amendment? I think that you have to apply a question of whether there is any reason specific to this traffic stop for denying Mr. Sharp the ability to broadcast the stop. So it cannot be a per se prohibition. And that's why the town of Winterville's policy is unconstitutional. There's not a sufficient – this case is important. It's going to dictate thousands and thousands. Let's accept the fact that we have a policy here. I think you make pretty good allegations on that. And it's pretty clear what the policy is. The policy is that you can't live stream, but you can record and broadcast later. The officer made that clear. So let's assume that's the policy. What is the test as to whether that policy is appropriate during a stop? That policy is appropriate where there is a compelling interest in prohibiting live streaming. Where did you get that standard? Compelling interest? Well, I think the whole policy – I'm asking you, the policy regulates what police may do during a traffic stop. Yes. And the question is, what is the standard, constitutional standard, for assessing whether that policy is appropriate? Yes, Your Honor. Well, if it was an as-applied challenge, then it would be whether the specific officer had violated the Constitution by not taking the phone away for a compelling reason. But if it was a facial challenge to the policy, as this is, the question is whether this blanket ban can be justified based on the evidence that the city of Winterville has adduced, which is none, and is narrowly tailored, which it is not. I respectfully suggest that I think the standard is reasonableness. That's where the court comes from, is whether the policy is reasonable. And this is a Fourth Amendment analysis, and I know your brief almost doesn't touch it at all. The government's brief does touch it and make the case, but they try to answer your First Amendment arguments. And obviously, First Amendment issues change when somebody is in police control. Your Honor, we don't dispute that the First Amendment analysis here is different. Otherwise, these cases wouldn't even exist. There would be no plausible basis at all. We have a case where the officer has said no live streaming, no telephone calling during a traffic stop. We don't, but we think that's… Well, no, Your Honor. We don't have any no live streaming case anywhere in the country, but we think that's because it's virtually self-evident that broadcasting is subject to the same analysis. A person being stopped? Yes, Your Honor. Yes, because if the… Again, this is about a per se ban. The officers had no reason based on any facts. They just said that it was something that they could ban because they felt like banning it. They didn't say that this particular individual was inciting individuals to come to the scene or soliciting anyone to come. He actually… The officer let him continue live streaming, I think in large measure, because the officer thought that it was okay to make an exception here because this case didn't raise any concerns. But next time, your phone is going to be taken away from you. Okay. I think it… I think you have some… Yes, Your Honor. I appreciate the opportunity to go over time. Thank you very much. All right. Mr. Hartzog. Thank you, Your Honor. May it please the court, Dan Hartzog, Jr., as I think your honors have recognized through your question, this is not a case about whether there is a general right to record police officers in their public duties. That's just simply not before the court. What is before the court is the right of a passenger in a seized vehicle, lawfully stopped, traffic stopped, to live stream the encounter from within the vehicle, which is… Can I start with what I would have thought Mr. Tutte's answer was? Judge Niemeyer's question is that often we have government action that could violate more than one constitutional provision. We think about that in the, for example, the Fourth and the Eighth Amendment could go together in a particular context or other government action that involves more than one constitutional provision. We tend not to permit that in the context of the due process clause in the Fourth Amendment area because we think the more specific Fourth Amendment governs over the more general due process clause. But is there any reason to think that the action here… could be wholly consistent with the Fourth Amendment and yet also infringe on the First Amendment rights? Assuming that they exist here, right? I understand on the merits maybe they don't, but wouldn't we think about those two violations separately? Well, I think your honors have picked up on the fact that there is an intersection in this case between the Fourth Amendment and the First Amendment. And I think when you're in a setting of a traffic stop, the Fourth Amendment controls. Well, but it wouldn't control, right? So the real answer is what the Fourth Amendment does in that context is it informs the government's interest a great deal, right? It might ultimately be dispositive about the government's interest, but we're still asking whether that's a First Amendment violation, right? The Fourth Amendment doesn't preempt the field, right? We just say, okay, whatever degree of government interest is required, and we can have that debate, I'm trying to bracket that for a minute, that question is informed by the government's interest in controlling the scene and ensuring officer safety, right? Those are vital government interests that are really important, and we see that through the Fourth Amendment in those lines of cases, but we're still analyzing it through the lens of whether this is a First Amendment violation, right? Correct, your honor. And I think the answer to that is to the extent you're looking at the First Amendment analysis of someone in a traffic stop, what you're looking at is, is restriction on live streaming a reasonable time, place, and manner restriction? Right, and so then... Is that what you think is the analysis? Every stop case from the Supreme Court, they start under the Fourth Amendment, and even though the rights being infringed are First Amendment rights, such as taking the passenger and putting the passenger under physical control, which is a First Amendment right, they never address the other amendments being infringed. Rather, they examine the Fourth Amendment seizure and determine whether the seizure and the conduct of the officers is reasonable. And you don't see this in any of those cases where they said this interferes with, for instance, taking a gun from a person during a traffic stop. They don't talk about the Second Amendment. Counsel, if I can just add to that and clarify, is it your position that the officer would have had the right to do what he did to reach in and try and grab the phone had the phone been off? In other words, simply as a Fourth Amendment matter, during a traffic stop, can a police officer simply reach into the car and take the phone, articulating officer safety or controlling the scene? I don't believe so, Your Honor, but that's obviously not the case here. What the officer was doing was he said, you cannot live stream, the individual continued to live stream in defiance of the officer's directive, which the officer clarified was for officer safety reasons. At that point, I think the officer does have the right, consistent with the Fourth Amendment, to, you know, as same as you would seizing a gun, ordering the individual out of the vehicle, placing the individual in handcuffs for the duration of the stop. All of these things have been found to be reasonable in the context of a traffic stop. So I think seizing a gun… Well, do they require the police officer to articulate some reason to infringe on a right? In other words, if it's an ordinary traffic stop or going through a stop sign and the officer interacts with the passenger and the driver, at what point can the officer then demand to have them get out of the car or to then frisk them or to then put them in handcuffs? Do each of those things require some fact on the part of the officer or can every traffic stop become a traffic stop in which the individuals are asked to get out of the car and be put in handcuffs? I think the general case law in this, Your Honor, is that the inherent dangerousness of traffic stops has been long recognized by the Supreme Court, not based on the fact that, well, this is just a minor traffic stop, but based on the potential for a traffic stop to turn into a more serious, potentially deadly, violent encounter. So the mother of five small children who's pulled over for running through the stop sign can be viewed as potentially dangerous and asked to be stepped out of the car and frisked because she might be armed? Well, I think it's a reasonable standard, Your Honor. Not frisked, though, right? You agree that frisked is a separate standard, right? You'd have to show dangerousness. But she could be asked to get out of the car. That's correct. That would be the categorical piece of that. She can be asked to get out of the car. We might not love that, but the Fourth Amendment would say she can be asked to get out of the car. If she's got five kids, she might want to get out of the car anyway. But she couldn't be frisked, right? Those are all the Fourth Amendment limitations, right? That's right. You would have to have at least a reasonable suspicion of some danger, you know, potential weapon to frisk. Do any of the cases—I mean, Judge Niemeyer's point's a good one. None of the cases—we talk about milms in these lines of cases. But did any of those cases raise a First Amendment claim? Or as he's hypothesized, I mean, I haven't seen somebody actually— are you aware of a case where someone raised both a Second and a Fourth Amendment claim in the context of a stop and seizure? I haven't seen that come up. I'm not aware of any such cases, Your Honor. Nor am I aware of any such cases where, you know, the plaintiff is alleging a First Amendment right because typically these types of cases, traffic stops are analyzed under a Fourth Amendment standard. And the Supreme Court has held clearly that, you know, the— Right, but we would say, okay, totally legitimate, right? The officer stops the car. Everything, you know, Fourth Amendment is right. But then they beat the hell out of the guy, right? We would say, listen, the Fourth Amendment stop and seizure was great, but you can't beat the hell out of the guy. I mean, you know, to me, like, that's fine. Yes, you can stop. And it may well be the justifications for the stop are adequate justifications under the First Amendment lens that there's, you know, as your colleague would say, a compelling interest or however we want to frame the inquiry. There might be such an interest that is sufficiently tailored and all those things. But we've got to look at it through the First Amendment lens even if they complied with the Fourth Amendment. That's correct, Your Honor. But I think in the context—and this is why this case is so unique. This is not a bystander. This is someone who is seized. And I understood plaintiff's counsel to say it would be different if the suspect were in custody, which Fourth Amendment case law is clear they are. So this is the question that I want to ask. So assume—just hypothetically—assume on the individual claims, I found that qualified immunity properly applied. But when I get to the official capacity claims, qualified immunity doesn't apply. And assume that I believe there is a policy, or at least they've adequately alleged a policy. Can we decide this case as the district court did without sort of development of the reasons for the policy? I mean, we're hypothesizing about why the town might have adopted this policy, whether the policy is specific. Your colleague wanted to say it needed some specificness to this stop. We don't even know what the policy is. So it's really hard for me to evaluate the policy—alleged policy, I should say—given the record that we've got. How can I reach the conclusion that the government's interest, whatever standard it might be, is satisfied when we've got really no idea what the government's actual asserted interest was when they adopted the alleged policy? I think you're right in the sense that if the court were to determine that there is a policy set in place, it would be difficult for this court to determine the full constitutionality of that policy without knowing what the policy is. Or what the town's justification for adopting it was, or how it's applied, or any of those things. Correct, Your Honor. And in all candor, if this court were inclined to believe that there is an official policy or custom, I think the appropriate result might be to remand for further consideration. They allege, and they have some pretty good background for it, they allege that the policy is that you can't livestream or telephone during a traffic stop. He said he wasn't bothered by the telephoning because as soon as he engaged the driver, he shut the call off. But the policy included telecommunications during the traffic stop. And he said that was for the safety of the officers. I think you'd be looking at it as, is this policy a reasonable time, place, manner restriction on— Well, why do you do that? I don't understand why you'd say that. That's not the Fourth Amendment analysis. The Fourth Amendment analysis is whether a policy of preventing livestreaming during a traffic stop is reasonable. That's what the Supreme Court has said on all these cases. And reasonableness then determines whether it can be justified by officer safety or control of the situation or whatever the value is. As soon as my response— Do you have a case where, you know, when they tell somebody you can't move, you have to sit on the curb, and if you do, we'll cuff you. I mean, I think they can even cuff them to keep them in place there. That's an infringement of the freedom of movement protected by the First Amendment. Do we have a time, place, and manner analysis or First Amendment analysis? I suppose you're correct, Your Honor, that in this context of a traffic stop, perhaps time, place, and manner is not the analysis. If this were a First Amendment case, there's somebody out in the street looking at traffic stops. And the issue was the officers wanted to back the crowd up and said, don't get so close to your cameras and phones, and they're going to interfere. The question would be, can he move the crowd back under a First Amendment analysis? Because the First Amendment is being exercised in filming the police work. But here we have somebody who is seized who wants to exercise telecommunications. And the question is, sure, it implicates the First Amendment. But do we apply the First Amendment standard, or do we apply the Fourth Amendment for the seizure? I think, Your Honor, in the context of the traffic stop, you apply the Fourth Amendment. I thought a minute ago you agreed with me that you apply both. That it can comply with the Fourth Amendment and yet also violate some other constitutional provision. The reason that the Fourth Amendment cases don't address First Amendment claims is because the First Amendment claims weren't brought. We don't have cases with Fourth and First Amendment claims, and we tend to address the claims that are brought. That's correct, Your Honor. And that's where my time, place, manner comment comes into play, is because to the extent you're looking at a restriction, to the extent the Court believes there is a right to live stream, constitutional right, which has never been recognized, and this Court would basically, plaintiffs asking this Court to recognize a broad right unfettered to live stream at all times, including during a traffic stop. And I think the Fourth Amendment comes into play on that part. If you're looking at whether there is a right to live stream police officers in the first place, I think then the time, place, manner restriction analysis comes in, and this would be a perfectly reasonable targeted time, place, manner restriction, because the officer safety issue is a compelling, I'm sorry, not compelling, a substantial government interest. Substantial and weighty is the term that courts have used. The analysis is applied to an inmate who wants to exercise a First Amendment right from prison. He says, I have a First Amendment right to purchase magazines of all kinds. And the prison authorities say, we are going to censor those, and we're going to exclude a whole category of magazines that you can purchase. And so what is the analysis that's conducted there? Is that a time, place, and manner issue? Your Honor, forgive me, there is a lot of cases on that very topic. There's a whole lot of cases, and it says you don't lose your First Amendment rights, but they can impose in furtherance of penological interests. And that's a ton of fly in the whole arrangement there. But this is not a time, place, and manner under the First Amendment. We're in a totally different context. That's correct, Your Honor. And I suppose there's some distinction between being in a prison and being in a public setting. Of course there is, yes. But again, a traffic stop is more akin to being, is closer to the prison setting because you're subject to officer seizure and control. And the Supreme Court has said that officers... Temporary and... Temporary. Well, let me ask you, Counsel, at the very beginning of your remarks, and I don't want to mischaracterize them, I think you said the case is not about recording. And, of course, the officers conceded that recording was permissible. So is that your position, that had it simply been recording within the context of either the driver or the passenger, that that would have been permissible? There wouldn't have been a basis under the Fourth Amendment to prevent that? Your Honor, again, under the Fourth Circuit, that right has never been recognized. I understand there is a lot of case law in other circuits about the right to record. To the extent this court believes that is persuasive authority to the right to record... Let me ask you, is the right to record by somebody seized? And, again, that's the distinction in this case, Your Honor. That's totally... That's why I raised it from the very beginning of this case. People on the street, the press, and other people observing police work are under a totally different circumstance. We're talking about what are the rights of a person seized. Do we have cases where persons seized under the Fourth Amendment have a right to record? I'm not aware of any circuit case on that. We don't have that issue before us, but I just don't... Your response to the question really was sort of a giveaway. Well, Your Honor, I'm not aware of any decisions on that point. I think every circuit court that has recognized a right to record police say that it is subject to restriction. And so, you know... Yes, but that's the problem I had with your briefs. That addresses people's right outside of the police work to do it. I'm looking for the case, a circuit court case or a Supreme Court case, where the person actually seized is trying to record. Now, I don't think we have that before us. I think the policy alleged in this case is telecommunications during the stop. In other words, the give and take, the live streaming and the response or the telephone call. That is the policy described by the officer, and that's what they allege. Right. But just going to the question of whether there could be... whether you have a right to record, if the policy said you can't record, would that be unconstitutional? I think it's a little bit out of the way here, but is there a case that addresses that, a single case? Of the right to record from a... A person, a seized person. I'm not aware of any court ever recognizing that right, Your Honor, and that's why this case is not clearly established. Can I ask a similar question there? Part of the declaratory relief that's sought here is that they had a right to record, and I take that to mean a right for a seized person to record, a person in this context to record. Is there any reason they would have standing to bring that claim? I know you didn't raise a standing argument, but it's jurisdictional. Because here they were told they could record, right? So it seems hard for us to reach the question of whether a seized person has a right to record, because that was a right that was afforded here, and at least the allegations as we take them, they wouldn't have a basis for claiming that. I 100% agree with that, Your Honor, and I think the way they framed their allegation complaint was right to record and live stream. So they lack standing on the record piece because the officer said that's permissible, and they only have standing on the live stream piece, sort of subpart B of the requested relief and the declaratory claim. That's correct, Your Honor. They were told they could record. They were not stopped from recording. He said if you record, that's fine. This is about live streaming. It's an officer safety issue, and if this court were to recognize some right to live stream from within a seized vehicle, that is going to be a huge officer safety issue that, you know, I don't think it would be appropriate to put in some blanket rule that you have the unfettered right to live stream from a traffic stop. Your Honor, I do see my time is over. Yes, I do. Okay. And I want to allow Mr. McGinnis to speak. All right. We have Mr. McGinnis. You have three minutes. Good morning, Your Honor. As may it please the court, I am Michael McGinnis, and I'm honored to appear on behalf of the Southern States Police Benevolent Association. Your Honor, we rarely ask to come up here as we have in this case, and there's a reason why we're here, and it's because of the questions that you honors are posing. This court wisely prohibits counsel from live streaming in these proceedings, and I would assume it's because we don't need distractions and noises. Well, what's really different, Your Honors, about the seizure of a vehicle, that is an ongoing incident scene, and officers have legal duties, responsibilities, and protocols to follow. And what they're taught and trained is to look at these two things that God gave us, the hands, and things that are in those hands, especially when it is a metal object like a cell phone that can be and has been used as weapons. So just for a second, assume that everything you say is written in stone and accurate. Wouldn't we have to actually have some findings on that? You might say it. I might agree with it. One of my colleagues might not agree with it. But the nature of the governmental interest requires, like, evidence, right? I mean, I might intuitively understand what you're saying, but my intuition about your truthfulness or the accuracy of the representations about danger, it seems odd that that suffices in a First Amendment context, as opposed to needing, you know, witnesses and information about this is a real safety issue. You might be able to testify. One of your, you know, members could testify. But I'm hearing it from you, and I feel like I'm listening to an expert, which is not generally what we do. Your Honor, the court can discern from the record what was going on here, I believe, and the basic nature of what was unfolding at this scene. And when the officer, again, you can record, but you can't live stream. And the officer said, why? And that's in the record, Judge Richardson. The why part is important. It's because officers are well aware that those cell phones are used to trigger these electronic communications, and they can have gang members and other people showing up because of that. But we're going to make a judgment here. If we followed your path, we'd make a judgment. I don't even know what the judgment would be, right? Because we'd say a policy may be case-specific, may be per se. We don't know. It's not clear from the allegations. It's supported by an interest in officer safety without any, like, evidence to support that, other than the officer saying it's true, right, but no development of that, right? You're saying it's true, and full respect to your organization and you, right? But we don't tend to take evidence that way. Yes, Your Honor, I agree. But, again, I'm going to respectfully suggest that the court can discern from the record enough here. And if we apply this court's qualified immunity test from the could-have-reasonably-believed standard. Yeah, I'm totally with you on qualified immunity. I'm talking about the second question, which is the official capacity claim. Yes, sir. Right? And in that instance, you know, what the court said was, the lower court said, yeah, this is about officer safety. And that might well be true, but it's hard for me to understand how I know that as an evidentiary matter, that that's a real government interest, whatever the standard, right? We can talk about whether it's compelling or substantial or whatever that means to the extent those are different. But how do I know that it's, like, a real interest without some evidence? In most First Amendment cases or other cases, we require some evidence of the interest. Your Honor, I can certainly appreciate the court's desire to see more about it, but it's here on a Rule 12 review. And there is a record in there that you can discern from. And I think there's some reasonable implication. Rule 12C, right? Yes, it was judgment on the pleadings, Your Honor. And the complaint and the pleadings in this case include the transcript. Yes, sir. It's an exhibit to the complaint. And the video as well. Yeah. So there seems to be far more than just a nominal complaint. And, again, Judge Devers' analysis of that, from our perspective, was very reflecting. Judge Niemeyer, just one final point from me, if I can. You asked a serious question about what is the value of the officer taking away that cell phone. And, sir, we absolutely agree. It is an objective reasonableness standard when an officer starts taking actions at a scene that are individual seizures. But, again, sir, our point is when something is in a subject's hands, a wise officer is going to get those things out of his hands. Something as simple as an eyeglass case can inflict harm. But that's irrelevant to this case because the officer didn't suspect this was a weapon and so forth. The question challenged here is live streaming during the traffic stop. And he knew he was doing it. The officer did not fear and did not impose any policy with respect to holding a metal device in the hands. I understand your point that that's a risk situation. I mean, the guy comes up with an ax or he has a knife in his hand or whatever. The officer says, I need to take that during our traffic stop and probably would be upheld probably as a threat to the officer's safety. He has a right to maintain control and protect his own safety. Those are the two things the court has talked about, the Supreme Court. Anyway, thank you very much. Thank you, Your Honor. Mr. Tutte, do you have some rebuttal? Thank you, Judge Niemeyer. I would just like to hit a few points that came up at argument. I first just want to say even if you take a Fourth Amendment analysis and say that there has to be some kind of objective reasonableness, anything that goes beyond the ability to per se stop recording or stop live streaming, any interest that needs to be specific or articulable to that stop would mean that we win this case because there was nothing specific or articulable about what Mr. Sharp was doing that would have led the officers to believe that he was doing something dangerous. All he was doing was passively recording. And he was doing that for the same reason that everyone, many people, take phones out when they interact with police. He was afraid. But, you know, policies are legislative in nature. They're forward-looking for a full range of conduct. And we examine them in connection with stops for reasonableness. And the question is the reasonableness here can be discerned from the nature of the policy and the imposition on the defendant or the seized person. Of course, here the officer gave specific explanations and circumscribed the policy as he described it. It was only the live streaming. He says you can record it. And after the stop is finished, you can broadcast it. But during the stop, so that is the policy he was articulating. And that's the one you're challenging at this point. Your Honor, even accepting all of that, and we think there's a different analysis. Well, you alleged it. Yes, but I mean accepting the standard, the legal standard is reasonableness. Even accepting that at the policy level, the standard is unreasonable. There are plenty of individual traffic stops where either because of the nature of the stop or the people stopped in the car with the driver, there is no reason at all to prohibit live streaming. And so it still wouldn't, it would fail at that wholesale level of being reasonable. What's the reason for officers removing people from the car and putting them on the bank during the stop? What's the reason for when they have some suspicion, permitting them to frisk everybody, even if the person doesn't end up having a gun, if they are suspicious? In other words, what is the reason for requiring them to identify themselves? That's been upheld, local requirements to identify themselves. These are all categorical things that address the scope of the officers. It's not something they have to invoke every time. They don't have to take somebody out of the car every time. And they don't have to justify it when they do. Your Honor, if you say that live streaming can be prohibited at a wholesale per se level, you will eliminate the right to record as well because officers will always be able to say, I need to have your phone, I need it to be turned off. If the live streaming, if that's a prohibition, then you don't need to worry about whether it goes beyond the policy. The policy that the officer enforced was no live streaming by seized persons. Your Honor, to ensure that officers will routinely tell people they may not power up their phones, they will routinely say you have to have your phones in your pockets. If you were under arrest, would you let them power up? You told me that they would not. But while they're in the car, under arrest, you agreed that they should not be able to turn on their phones. As a matter of fact, their phones could be taken away from them. That's what you agreed. Under arrest, yes. So my point is there is a reason why they do that during an arrest, and it's just a categorical reason of safety, control, and preventing outside interference. Well, that same value applies when officers are trying to control a traffic circumstance. I don't think it applies to the same extent. And all I will say is if you go and look at those Supreme Court cases about traffic stops, the Supreme Court itself seems to be very reluctant. They see that it's a necessary evil that the individuals in the car are also being subject to the seizure. And they have really— I don't think you're reading. Not only have they reinforced that and said it categorically, they keep reciting all the officers that have been shot during traffic stops, and even recently they recited that. They keep reciting updated data about the risk of forced stops and that officers can take steps categorically to protect themselves. And it doesn't matter whether the particular person is a widow or the person looks like a tough guy or whatever. It seems to me that they, for protection, they can't make those judgments. So for protection, they go through certain procedures. If you know every state trooper approaches a car from the rear and at a certain angle, this is a procedure they're taught in order for their safety. Your Honor, this is—I can accept all of this, and I do accept all of this, and still say that the interest of the individual in the car and the interest of the public in being able to livestream what is happening or record what is happening— Let's explore that. What is the interest in a seized person who's going to be seized for probably no more than a half hour? We're talking about the length of traffic stops, and of course that's always the subject of lawsuits, how long can they last. But let's say a half hour, and he's told during the half hour, I don't want you recording or broadcasting. When we're done, you can do it again. Now what's his interest in doing it during the stop? His interest is both fear and actually deterring wrongdoing by the officers. So it helps to allay that anxiety that individuals feel when they are in a traffic stop with police officers and they don't know what those officers are going to do. There are people who fear the police. It's just an unfortunate fact. And the second interest—I mean, there's actually a third interest, which is the public's ability to see what happens. But the second interest is to hold everyone at the scene accountable. When a stop is live-streamed, it doesn't encourage people to come to the scene and attack the officers. It encourages everyone on the scene not to take any unlawful actions. And that— Can I follow up with this one question? I know we're well out of time. Judge, if you don't mind. Yes, I am. So you said a minute ago, in a couple of different ways, but I noted again, there's no reason at all to stop live-streaming. Assume for a minute I think that's wrong and that the question is whether the reasons for not doing live-streaming justify a limitation, either categorical or case-specific. We don't know because we don't know enough about the policy. If that's true, so I don't accept your view that there's like no reason whatsoever, is the right answer here to send it back to, in other words, vacate the official capacity claim with respect to live-streaming to allow there to be a record developed as to what the policy is? Like, is it categorical or case-specific? And then B, what's the government's interest? And is it a real interest or is it a feigned interest or how significant it is? And then maybe, depending on what test applies, look also at the evidence of tailoring. Your Honor, we think you should—we think we plead the policy adequately. So we think you should address the policy on its merits, which is a policy prohibiting live-streaming of police officers by passengers in stopped vehicles. If that is— You think you've pled it as a categorical rule? Yes. Okay. But in that—so I'll accept at least the theoretical point. But even so, if I don't accept your view that there's no reason at all to limit live-streaming, right, as your colleague said, we tend to limit live-streaming in the courtroom. So to say there's no reason at all seems a stretch to me. And the real question is, is the reason justify the action? That's a question that requires evidence. Yes, Your Honor. But I also want to say that this is one of those questions that sits at a really difficult intersection between policies that can have evidence developed. I mean, all First Amendment restrictions, even the most draconian, could theoretically be justified. And they just would have to meet strict scrutiny. It does raise that question. It's an interesting question because it raises the question of whether we have to analyze statutes or regulations or policies based on evidence or whether they can just be— I mean, I suppose a legislature can just pass a statute, put it on the books, and we analyze it under reasonableness as to its text and its reasonable effect. Why they did it may be totally obscure or not known or may be different for every legislature. So if we sent this back to find out who put the policy in or whatever, it seems to me that it's— and I think this is what you allege, we can assess the policy on its face, can't we? Your Honor, I think you can assess the policy on its face. I think Judge Richardson is right, though, and I was just trying to basically circle back to saying it's correct, that this gets resolved at summary judgment. But we think they just—we think they couldn't meet strict scrutiny. But if you think they can or should be given the opportunity, then yes. Where does strict scrutiny come in? We think that this is a content-based restriction because it only prohibits filming police officers. It's not based on content. Basically, it's a prohibition during a stop not to record regardless of what's being recorded. Even if it's intermediate scrutiny, it would still go off at summary judgment, I think, and I think Judge Richardson is right about that. Well, then you're suggesting this whole case should be analyzed under the First Amendment standards as opposed to a Fourth Amendment. Even under a Fourth Amendment standard, if you thought that there was a standard that the legislature had to meet— There is a standard. The Supreme Court's articulated it several times. Then we would still have to go to evidence to see if that could be substantiated. There would still need to be a justification for the policy. Can I ask one other question just to give you an opportunity to respond to? You seek a declaratory judgment for two things. One is to record and one is to live stream. I'm simplifying slightly, but A and B in your declaratory judgment piece. How do I find that you have standing on the recording piece given that the officer told your client that he could record? I have a hard time seeing under our standards of sort of eminent and likely repetition that you've got standing there. Two reasons. I'll do the better one first. That's a good one. We can plead in the alternative, and the officer might have been retaliating because he just didn't like being recorded and that saying it was because it was live streaming was a pretext. Go to the next one. That's bad. That was the best one. You shouldn't have given away the order on the front end because after that one, you should say, now this is my better one. Then, of course, like the coup de grace, the greatest one would be that live streaming has two components. It has a recording component and it has a streaming component. We don't know which aspect of live streaming was the reason that live stream— so he was broadcasting to a remote server that was recording what was happening, and so that would be the other way that it was broken out as live streaming is actually recording and then broadcasting. Thank you, Mr. It's very interesting. We've extended the argument somewhat. I appreciate the arguments. It's an interesting case. Our practice would be to come down and shake your hands and thank you for these arguments, and it's an important practice, I think, but we're still following the COVID protocols, and so we'll pass on that this time. When you come back, we'll shake your hands again. We'll proceed on to the next case.
judges: Paul V. Niemeyer, Julius N. Richardson, Michael Stefan Nachmanoff